**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **MICHELLE HAMMOND-BEVILLE,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | **Civil Action No:** |
| **v.** ) | |
| ) | |
| **JEFF LANDIS,** ) | **Judge** _____ |
| ) | |
| **KATHY MORANTE,** ) | |
| ) | **Magistrate Judge** _____ |
| **RON CARTER,** ) | |
| ) | |
| **JASON SHARPE,** ) | **JURY DEMAND** |
| ) | |
| **And** ) | |
| ) | |
| **CHEATHAM COUNTY, TENNESSEE** ) | |
| ) | |
| *Defendants.* ) | |

## <u>COMPLAINT</u>

1. Plaintiff **MICHELLE HAMMOND-BEVILLE** brings this action pursuant to 42 U.S.C.

   § 1983 and Tennessee state law against Defendants **JEFF LANDIS, KATHY**

   **MORANTE, RON CARTER, JASON SHARPE, and CHEATHAM COUNTY,**

   **TENNESSEE** alleging violations of her rights under the Fourth and Fourteenth

   Amendments to the U.S. Constitution and Tennessee law.

### PARTIES

2. Plaintiff Michelle Hammond-Beville is a resident of Robertson County, Tennessee.

3. Defendant Jeff Landis is a resident of Cheatham County, Tennessee.

4. Defendant Kathy Morante is a resident of Davidson County, Tennessee.

5. Defendant Ron Carter is a resident of Williamson County, Tennessee.

6. Defendant Jason Sharpe is a resident of Wilson County, Tennessee.

1

7. Defendant Cheatham County, Tennessee ("Cheatham County") is a municipal government organized under the laws of the State of Tennessee.

## JURISDICTION AND VENUE

8. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## FACTUAL BACKGROUND

### A. Plaintiff's Career Background

9. Plaintiff is a forty-seven-year old sworn police officer with the Metropolitan Nashville Police Department ("MNPD"), where she holds the rank of sergeant. Plaintiff has served as a sworn officer since the year 2002, first with the Orlando Police Department and then starting in 2005 with MNPD

10. From 2016 until the events at issue in this lawsuit, Plaintiff was assigned to MNPD's Office of Professional Accountability ("OPA"), the MNPD division charged with investigating allegations of serious officer misconduct.

11. MNPD has never imposed a disciplinary suspension on Plaintiff based on findings of misconduct.

12. In addition to her MNPD career, Plaintiff served in both the Army National Guard and the U.S. Army Reserves from 2006 – 2014. From 2009 – 2010, Plaintiff was deployed on active duty to Iraq and Kuwait. Plaintiff has earned the following commendations for her military service:

   a. The National Defense Service Medal;

2

    b.   Global War on Terrorism Service Medal;

    c.   Iraq Campaign Medal With Star;

    d.   Army Service Ribbon;

    e.   Overseas Service Ribbon;

    f.   Armed Forces Reserve Medal with M Device

13. Plaintiff has never been arrested or faced criminal charges, other than the matter that gives rise to this lawsuit.

### B. Plaintiff's Family

14. Plaintiff is a married woman who resides with her husband, Bryan Beville. Plaintiff and Mr. Beville married in 2012.

15. Plaintiff and Mr. Beville have a "blended family," each having brought children to the marriage. Plaintiff and Mr. Beville's four children are Alexandria Beville (presently age 19), S.B. (presently age 17), E.H. (presently age 14), and C.H. (presently age 11).

16. A.B. and S.B. are Plaintiff's stepchildren by way of marriage to Mr. Beville.  Mr. Beville had sole custody of the children prior to marrying Plaintiff due to the children's mother's inability to properly exercise parenting time.

17. E.H. and C.H. are Plaintiff's by way of adoption.  Plaintiff adopted E.H. and C.H. from her cousin in 2010, because Plaintiff's cousin was unable to take care of them.

18. During the bulk of the events at issue in this lawsuit that relate to the children, most of which took place in late 2017 and early 2018, all four children resided with Plaintiff and Mr. Beville.

19. Several years prior to the incident that gave rise to this lawsuit, S.B. made severe abuse allegations against Mr. Beville.

3

20. S.B.'s abuse allegations against Mr. Beville were investigated by the Tennessee Department of Children's Services ("DCS") and determined to be unfounded.

21. From a young age, S.B. was diagnosed with significant mental health issues and received continuous mental health treatment.

22. From a young age, S.B. engaged in a consistent pattern of lying and dishonesty both at home and in school.

23. Even though her own mother was not able to take care of her, S.B. did not want a stepmother. After Plaintiff and Mr. Beville were married, S.B. hatched a plan to remove Plaintiff from their lives by making false abuse allegations against her. S.B. documented this plan in her journal in 2017, prior to making the false allegations that ultimately gave rise to this lawsuit.

24. S.B. had difficulties relating to peers at school, and often felt unliked. Through experience, S.B. learned that one way she could get peer attention was by representing herself as a victim and engendering sympathy.

### C. Defendant Landis

25. Defendant Jeff Landis is a former deputy with the Cheatham County, Tennessee Sheriff's Office ("Sheriff's Office") who served in that capacity until he resigned on April 5, 2019.

26. Defendant Landis resigned after Cheatham County Sheriff Michael Breedlove received a letter from Ray Crouch, District Attorney General for Tennessee's 23rd Judicial District, stating that Landis's testimony had been impeached so many times that his credibility was not sufficiently reliable for the D.A.'s Office to continue relying on him as a witness.

27. After Landis resigned, the District Attorney's Office for the 23rd Judicial District ("D.A.'s Office") began dismissing all of the criminal cases that Landis had initiated.

4

28. One of the cases that the D.A.'s Office ultimately dismissed was a misdemeanor child abuse charge against Plaintiff that Landis had initiated based on a false allegation made by S.B., who had claimed that Plaintiff had punched S.B.'s stepsister, A.H.

29. As detailed below, prior to obtaining the indictment against Plaintiff Landis was already well aware that S.B.'s false allegation had been discredited and recanted.

### D. Defendants Morante, Sharpe, and Carter

30. Metro Nashville Police Department's "Office of Professional Accountability" ("OPA") is an internal investigations unit charged with responsibility for investigating allegations of serious misconduct by MNPD officers.

31. When a misconduct allegation is assigned to OPA, OPA assigns an investigator who then conducts an investigation, makes preliminary factual findings, and documents the investigation and proposed findings. The investigator's investigation and findings are then reviewed by the OPA Lieutenant, who can either approve or reject them. If the Lieutenant approves an investigation and findings, then OPA's Director must review them and either approve or reject them. If the OPA Director approves them, then they are referred to the subject officer's chain of command for the imposition of discipline pursuant to MNPD's disciplinary process.

32. Defendant Morante has been the OPA Director for several years, and served in that capacity at all times relevant to this lawsuit.

33. Defendant Sharpe has been the OPA Lieutenant for several years, and served in that capacity at all times relevant to this lawsuit.

34. Defendant Carter has been an OPA Investigator for several years, and served in that capacity at all times relevant to this lawsuit.

5

35. For several years leading up to the events at issue in this lawsuit, OPA had a *de facto* practice of tending to protect MNPD staff who held the favor of the MNPD administration, while unfairly prosecuting those officers who did not have such favor.

36. The officers whom OPA has protected have disproportionately been white males, while the officers whom OPA has unfairly prosecuted have disproportionately been those with other demographic backgrounds.

37. During her tenure at OPA, prior to the events that give rise to this lawsuit, Plaintiff spoke out against the practice of protecting politically favored officers and the practice of unfairly prosecuting disfavored officers.

38. On information and belief, Defendants Morante, Sharpe, and Carter developed a bias against Plaintiff due to her protests against OPA's practices.

### E. The False Child Abuse Allegation

39. In January 2018, S.B. made the false child abuse allegation that Landis ultimately used to get Plaintiff indicted.

40. At this point E.H. was 12 years old, C.H. was 8 years old, A.B. was 16 years old, and S.B. was 14 years old.

41. S.B.'s claim was that her stepsister, E.H., had told her that Plaintiff had punched her (E.H.) in the face.

42. Plaintiff had not, in fact, hit E.H.

43. E.H. had not, in fact, told S.B. that Plaintiff had hit her.

44. S.B. made this claim at school, both to get attention from her peers and to seek Plaintiff's removal from her life.

45. S.B.'s false allegation spurred an investigation by law enforcement and DCS personnel.

6

46. On February 1, 2018, a DCS forensic interviewer interviewed S.B., E.H., and A.B. regarding the household circumstances and S.B.'s allegation.

47. During her recorded forensic interview, E.H. denied that Plaintiff had ever hit her or any of the other children.

48. During her recorded forensic interview, S.B reiterated her claim that Plaintiff had hit E.H. In addition, S.B. added a second claim to the effect that Plaintiff had also hit A.B. back in December 2017. However, S.B. also admitted that she (S.B.) has "a history of lying and not doing the right things."

49. A.B. denied that Plaintiff had ever hit her or any of the other children.

50. After the forensic interviewer completed her interviews, Defendant Landis went into the interview room with E.H. and conducted a second interview.

51. Landis broke all the investigative protocols for child forensic interviews, making a concerted effort to persuade E.H. to implicate Plaintiff rather than employing safeguards to ensure that E.H. gave an unbiased account.

52. For instance, Landis told E.H. an elaborate false story about how he was formerly a medical pediatrician who had sacrificed a great deal of income to transition into law enforcement because he cares so much about protecting children. This was completely untrue, as Landis had no prior medical experience, education, training, or professional achievements whatsoever. Landis then falsely claimed that his supposed medical expertise allowed him to infer from a bruise on E.H.'s face that she had been abused.

53. Notwithstanding Landis's outrageous efforts to coerce her into implicating Plaintiff, E.H. reiterated that Plaintiff had never abused her. E.H. explained that she had gotten the bruise while visiting her aunt in Florida by tripping and hitting her face on a table.

7

54. On information and belief, immediately after the interviews Landis reported to Defendant Morante that Plaintiff had abused E.H.

55. Defendant Morante reported the allegation to MNPD command staff, and MNPD decommissioned Plaintiff pending an internal investigation on February 2, 2018.

56. In early February 2018, S.B. admitted in a recorded conversation with A.B. and Plaintiff's mother that her abuse allegations against Plaintiff were false.

57. On February 9, 2018, Plaintiff voluntarily gave an interview regarding S.B.'s false abuse allegation to Defendant Landis.  Plaintiff denied having abused any of the children, and provided information to Landis regarding S.B.'s history of mental illness, false allegations, dishonesty, and motive to remove Plaintiff from her home.

58. On March 5, 2018, DCS filed a Cheatham County, Tennessee Juvenile Court ("Juvenile Court") petition alleging that Plaintiff had abused E.H. as alleged by S.B.

59. However, DCS never sought a safety plan or the removal of any of the children from Plaintiff's home.

### F.  The Guardian ad Litem and DCS Determine that S.B.'s Allegation was False

60. The Juvenile Court appointed attorney Tia Bailiff to serve as Guardian ad Litem on behalf of all four children – Alexandria, S.B., E.H., and C.H.

61. Ms. Bailiff is and was an experienced guardian ad litem, with a reputation in Cheatham County of being extremely thorough in her work and highly protective of children.

62. Ms. Bailiff interviewed all four children, investigated the allegations, and reviewed the relevant evidence.

63. Each child, including S.B., told Ms. Bailiff that S.B.'s abuse allegations against Plaintiff had been false.

8

64. S.B. also told Ms. Bailiff that she had made the false abuse allegations against Plaintiff in order to get attention from her peers at school.

65. Based on the statements of the children, S.B.'s background and characteristics, the relevant evidence, and her overall investigation, Ms. Bailiff determined that Plaintiff had not abused E.B. or any of the other children.

66. Ms. Bailiff communicated her findings to DCS, along with a detailed analysis supporting her conclusion that S.B.'s abuse allegations had been false. Ms. Bailiff urged DCS to dismiss the Juvenile Court abuse petition against Plaintiff.

67. Independently, DCS conducted its own investigation and, like Ms. Bailiff, determined that S.B.'s abuse allegations against Plaintiff had been false.

68. On April 10, 2018, DCS and the other parties appeared in Juvenile Court.

69. Ms. Bailiff, the DCS attorney, and Plaintiff's Attorney Jim Todd appeared in chambers to discuss the allegations and evidence with the Juvenile Court judge.

70. Ms. Bailiff and DCS explained in detail why they had concluded that S.B.'s abuse allegations were false.

71. After the meeting in chambers, DCS moved on the record to voluntarily dismiss its abuse petition against Plaintiff.

72. The Juvenile Court granted DCS's request, terminating the Juvenile Court case with no adverse findings against Plaintiff.

**G. Defendants Prosecute Plaintiff through Both Criminal and Administrative Proceedings**

73. Landis continued pressing for criminal charges to be initiated against Plaintiff, and for Plaintiff to be fired from MNPD, in spite of Ms. Bailiff's and DCS's findings and the Juvenile Court's decision to dismiss the petition.

9

74. In May 2018, Ms. Bailiff received a call from Assistant District Attorney Margaret Sagi asking why the DCS petition had been dismissed. Ms. Sagi told Ms. Bailiff that Landis had represented to her that it was a clear-cut case of abuse, and said that Landis was pressing for prosecution. Ms. Bailiff explained to Ms. Sagi that all four of the children had denied the alleged abuse, and that based on the evidence and her investigation she had determined that S.B.'s abuse allegations had been false.

75. On information and belief, Landis also remained in contact with staff from MNPD's Office of Professional Accountability, pressing for Plaintiff to be fired from MNPD.

76. On June 13, 2018, four months after MNPD decommissioned Plaintiff, the Office of Professional Accountability opened an investigation into S.B.'s abuse allegations.

77. OPA assigned Defendant Carter to investigate S.B.'s allegations.

78. Plaintiff fully cooperated with the OPA investigation.

79. As part of the OPA investigation, Defendant Carter summoned Ms. Bailiff, the Guardian ad Litem, for an interview. Ms. Bailiff informed Carter that Alexandria, E.H., and C.H. had all denied any abuse, and that S.B. had said she "wasn't sure if any of the claims were true." Ms. Bailiff told Carter that she believed E.H., and that based on her overall investigation she had concluded that S.B.'s abuse allegations had been false.

80. On August 9, 2018, Defendant Morante called Mr. Todd, Plaintiff's attorney. Morante told Todd that the OPA investigation was closed, and that Plaintiff had to choose between resigning or being terminated.

81. On August 23, 2018, Defendant Carter finished his draft investigation report and turned it in to Defendants Sharpe and Morante.

10

82. Carter's report alleged that Plaintiff had abused E.H. and that Plaintiff had lied by denying the abuse.

83. Carter's report acknowledged that E.H. had denied the abuse, acknowledged Ms. Bailiff's and DCS's findings that Plaintiff was innocent, and acknowledged the Juvenile Court's dismissal of DCS's abuse petition. However, Carter's report discounted all of the reasons to disbelieve S.B.'s false allegations in favor of Landis's assertion that Plaintiff was guilty of abuse and of falsely denying the abuse.

84. Defendant Sharpe reviewed Carter's report, which included detailed summaries of E.H.'s denial as well as Ms. Bailiff's reasons for concluding that Plaintiff was innocent. Defendant Sharpe also had access to the interviews and evidence from the investigation. Regardless, Sharpe approved Carter's conclusion that Plaintiff was guilty of both abuse and dishonesty.

85. Defendant Morante reviewed Carter's report, which included detailed summaries of E.H.'s denial as well as Ms. Bailiff's reasons for concluding that Plaintiff was innocent. Defendant Morante also had access to the interviews and evidence from the investigation. Regardless, Morante approved Carter's conclusion that Plaintiff was guilty of both abuse and dishonesty.

86. On October 23, 2018, Defendant Sharpe met with Plaintiff for an MNPD "presentation meeting" as part of MNPD's codified disciplinary process. Sharpe read the disciplinary charges to Plaintiff, and advised that MNPD would be seeking Plaintiff's termination.

87. On November 16, 2018, Plaintiff and Defendant Sharpe met for an MNPD "Settlement Meeting" as part of MNPD's codified disciplinary process. Plaintiff formally pleaded "not guilty," and requested an administrative hearing to contest the disciplinary charges.

11

88. On November 20, 2018, Defendant Landis had a background check performed on Plaintiff by the Regional Organized Crime Information Center ("ROCIC").

89. On November 21, 2018, Defendant Landis obtained a second search warrant for Plaintiff's personal cell phone records.

90. Throughout the summer and fall of 2018, Defendant Landis continued pressing the District Attorney's Office to file criminal charges against Plaintiff.

91. Defendant ultimately succeeded in getting the abuse allegation against Plaintiff docketed in front of the Cheatham County Grand Jury.

92. In January 2019, Defendant Landis appeared before the Cheatham County Grand Jury to prosecute the case against Plaintiff.

93. On information and belief, Landis misrepresented the evidence through falsehoods and material omissions to convince the Grand Jury that Plaintiff was guilty of child abuse.

94. Because of Landis's misrepresentations and material omissions, the Grand Jury indicted Plaintiff for misdemeanor child abuse.

95. If the Grand Jury had been informed of the exculpatory evidence regarding S.B.'s abuse allegation, especially the fact that S.B. herself had since recanted it, the Grand Jury would not have indicted Plaintiff.

96. After learning of the indictment, Plaintiff turned herself into the Cheatham County Sheriff's Office to be booked.

97. Plaintiff spent several hours in jail before being allowed to bond out.

98. While in jail, Plaintiff was placed in a cell with men and handcuffed to a post in the wall.

99. Defendant Landis paraded around the cell while Plaintiff was incarcerated there.

100. Well after the booking process was complete, another Cheatham County Sheriff's deputy made Plaintiff stand against the wall of her cell and then took photos of her. The deputy told Plaintiff, "These are for Facebook."

## H. Plaintiff Fights the Criminal Charge, Landis Resigns, and the Indictment is Dismissed

101. After bonding out of jail, Plaintiff spent the next ten months fighting the indictment.

102. In the meantime, MNPD Deputy Chief Hagar continued pressuring Plaintiff to resign. When this would not work, Hagar threatened demotion. However, MNPD never scheduled an administrative hearing in order to give Plaintiff the opportunity to contest the disciplinary charges.

103. In March of 2019, Cheatham County Sheriff Breedlove received a letter from District Attorney Ray Crouch indicating that Defendant Landis's testimony had been impeached so many times that the D.A.'s Office could no longer rely on Landis's credibility, and would no longer be calling him as a witness in court.

104. Sheriff Breedlove conducted a review of Landis's work product, and noted several other concerning deficiencies in addition to those raised by the D.A.'s Office.

105. On April 5, 2019, Sheriff Breedlove confronted Landis regarding these allegations.

106. During this meeting, Landis agreed to resign. Landis submitted a letter of resignation that same day.

107. In the ensuing months, the D.A.'s Office moved to dismiss all of the criminal cases that Landis had initiated.

13

108.     On November 12, 2019, the Cheatham County Circuit Court dismissed Landis's

indictment against Plaintiff.

**I.  MNPD Keeps Plaintiff Decommissioned for 10 More Months Before Finally Dismissing the Disciplinary Charges Without a Hearing**

109.     Once the indictment was dismissed, Plaintiff's disciplinary attorney made MNPD

officials aware of both the dismissal and Landis's resignation.

110.     Regardless, MNPD continued the disciplinary charges in a "pending" status,

continued pressuring Plaintiff to accept a demotion, and kept Plaintiff decommissioned

for another ten months without a hearing.

111.     In September 2020, MNPD dismissed the disciplinary charges against Plaintiff

without a hearing and reinstated her to active duty.


## CLAIMS FOR RELIEF

### COUNT I: MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS (42 U.S.C § 1983)

### (DEFENDANT LANDIS)

112.     Plaintiff hereby reincorporates paragraphs 1 – 111 by reference.

113.     Defendant Landis participated in, influenced, and/or made the decision to file

criminal charges against Plaintiff for the Tennessee offense of *Misdemeanor Child Abuse*.

114.     Defendant Landis did not have probable cause to support this false charge.

115.     Defendant Landis's false criminal charge deprived Plaintiff of her liberty.

116.     Defendant Landis's indictment against Plaintiff was ultimately dismissed.

117.     Defendant Landis acted with reckless and intentional disregard for Plaintiff's

rights in initiating the indictment against her.

14

118. Defendant Landis's false criminal charge inflicted emotional pain, a deprivation of liberty, and financial losses on Plaintiff.

## COUNT II: TENNESSEE COMMON LAW MALICIOUS PROSECUTION FOR THE MNPD DISCIPLINARY PROCEEDINGS

### (DEFENDANTS LANDIS, MORANTE, SHARPE, AND CARTER)

119. Plaintiff hereby incorporates paragraphs 1 – 111 by reference.

120. Defendant Landis intentionally influenced and urged the decision to institute MNPD disciplinary proceedings against Plaintiff.

121. Defendants Morante, Sharpe, and Carter made the decision to institute MNPD disciplinary proceedings against Plaintiff.

122. Defendants lacked probable cause to support the MNPD disciplinary proceedings they instituted against Plaintiff.

123. The MNPD disciplinary proceedings against Plaintiff were ultimately dismissed.

124. Plaintiff suffered emotional damage, career damage, and financial losses as a result of Defendants' unfounded MNPD disciplinary proceedings.

## COUNT III: LIABILITY FOR MISCONDUCT OF SHERIFF'S DEPUTY (T.C.A. § 8-8-302)

### (DEFENDANT CHEATHAM COUNTY)

125. Plaintiff hereby reincorporates paragraphs 1 – 111 by reference.

126. Until April 5, 2019, Defendant Landis was at all times pertinent to this lawsuit a deputy of the Cheatham County Sheriff's Office.

127. Defendant Landis's actions against Plaintiff were all taken under color of law while operating in his capacity as a Cheatham County Sheriff's Deputy.

15

128.    Defendant Cheatham County is responsible for Defendant Landis's misconduct pursuant to T.C.A. § 8-8-302.

## REQUEST FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiff prays:

1.  That the Defendants Answer this Complaint within the time provided by law.

2.  That this cause be tried by a jury.

3.  That judgment for Plaintiff enter against the Defendants on each count.

4.  That Plaintiff be awarded nominal damages on all counts.

5.  That Plaintiff be awarded compensatory damages in an amount determined by the jury.

6.  That Plaintiff be awarded punitive damages in an amount determined by the jury.

7.  That Plaintiff be awarded attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8.  That the court costs in this matter be taxed to Defendants.

9.  That Plaintiff be awarded pre- and post-judgment interest against Defendants.

10. That Plaintiff be awarded all other relief to which it may appear she is entitled in the interests of justice.

16

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
414 Union Street, Suite 900
Nashville, TN 37219
T: (615) 982-8002 / F: (615) 229-6387
E: kyle@mothersheadlaw.com

17